Not for Publication

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| WANDA WILSON,<br><br>    *Plaintiff*,<br><br>v.<br><br>JPMORGAN CHASE, JAMES DIMON, individually and in his official capacity, JANE and/or JOHN DOES 1-10, and XYZ Entities 1 to 10,<br><br>    *Defendants*. | Civil Action No. 18-13789<br><br>(JMV) (JBC)<br><br>**OPINION** |

## JOHN MICHAEL VAZQUEZ, U.S.D.J.

This case comes before the Court on a motion to dismiss, D.E. 9-1, filed by JPMorgan Chase Bank, N.A[1] ("JPMC" or the "Bank") and James Dimon[2] (collectively "Defendants") to dismiss Plaintiff Wanda Wilson's Complaint, D.E. 1-1. Plaintiff alleges employment race discrimination, hostile work environment, and retaliation in violation of the New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5-1 *et seq.* ("LAD").[3] Defendants move to dismiss the Complaint in its entirety with prejudice for failure to state a claim under Federal Rule of Civil

---

[1] Defendants note that Plaintiff incorrectly identified this Defendant in the Complaint as "JPMorgan Chase." Def. Br. at 1.

[2] It appears that Plaintiff also incorrectly identified Defendant Dimon in the caption as "James" rather than "Jamie." The body of the Complaint does make a reference to Jamie Dimon.

[3] Plaintiff additionally alleged tort claims for intentional and negligent infliction of emotional distress in the Complaint but voluntarily withdrew those claims. Opp. at 5.

Procedure 12(b)(6). The Court reviewed the parties' submissions[4] and decided the motion without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b). For the reasons that follow, Defendants' motion to dismiss, D.E. 9-1, is **GRANTED** but the dismissal is without prejudice.

## I. BACKGROUND[5]

Plaintiff is an African-American female from New Jersey. Compl. ¶¶ 1, 10. She was hired by Defendant in or about 1997, eventually reaching the level of Executive Administrative Assistant until she was terminated in May or June 2018. *Id.* ¶ 10. Plaintiff claims that throughout her employment she was an exemplary employee and always received "meets or exceeds expectations" on her performance reviews. *Id.* ¶¶ 12-13.

Plaintiff states that she had noticed disparities in the terms and conditions of employment at JPMC between African-American employees and their non-African-American counterparts, but never spoke out about these disparities publicly. *Id.* ¶¶ 21-22. She alleges that she had observed other African-American employees face adverse consequences after objecting to discriminatory practices. *Id.* Plaintiff does not support these broad allegations with any specific facts or examples. Plaintiff recalls a statement that Defendant Dimon, CEO of JPMC, made around August 2017 addressing racial disparity, saying that JPMC was "making a special effort" to bring on more African Americans and that the company has "got to do better with African-Americans and [they are] going to." *Id.* ¶ 24. Plaintiff claims that she believed in Dimon's sincerity and that he was committed to resolving the racial disparity at JPMC. *Id.* ¶ 25.

---

[4] Plaintiff's Complaint, D.E. 1-1, is referred to as "Complaint" or "Compl." Defendants' brief in support of its motion, D.E. 9-1, is referred to as "Defendants' Brief" or "Def. Br." Plaintiff's brief in opposition, D.E. 16, is referred to as "Opposition" or "Opp." Defendants' reply brief, D.E. 17, is referred to as "Reply Brief" or "Reply Br."

[5] The Court draws the following facts from Plaintiff's Complaint, which are taken as true for the purposes of the current motion. *See James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d Cir. 2012).

Around March 2016, Plaintiff was assigned as the Executive Administrative Assistant for Paul Jensen, who was the Managing Director, Chief Administrative Officer, and Head of Audit. *Id.* ¶ 26. Around this time, Janet Jarnigan was also assigned to Jensen as a Team Leader. *Id.* ¶ 27. Plaintiff felt that over time, Jarnigan and Jensen began working closer together, and Plaintiff was relegated to a more subservient role. *Id.* ¶¶ 29-30. Plaintiff asserts that Jarnigan treated her differently than non-African American employees in the same position, but fails to provide any specific allegations in support. *Id.* ¶ 32.

Plaintiff says she complained to Jensen that Jarnigan was exceeding her authority, spreading false rumors about Plaintiff to other secretaries, and creating a hostile working environment. *Id.* ¶ 35. Jensen did not intervene, responding that there were two sides to every story and stating that Plaintiff was being a bit dramatic. *Id.* ¶ 36. Plaintiff then filed a complaint with Samantha Garber, Executive Director and Head of Audit, Human Resources ("HR"), seeking intervention to remediate the hostile work environment. *Id.* ¶ 37. Plaintiff asserts that she noticed a dramatic change in Jensen's attitude toward her after the complaint and that he began questioning her work, treating her with distrust, and giving her terse and dismissive responses. *Id.* ¶¶ 38-39.

Plaintiff notes that she also began to feel colleagues distancing themselves from her. *Id.* ¶ 40. On April 4, 2017, several colleagues told her that Jarnigan had spread rumors about her, including that Plaintiff had made a non-African-American officer cry and that Garber had reprimanded Plaintiff in December 2016. *Id.* ¶ 41. Plaintiff also claims that Jarnigan had mockingly referred to a stack of folders between their desks as the Mexican/U.S. wall although the folders were there to create a filing system requested by Jensen. *Id.* ¶ 42.

Around April 5, 2017, Plaintiff took a sick day and again called Garber to report the hostile work environment she felt Jarnigan was causing, and further complained that Jarnigan was

3

bullying her, belittling her work ethic, and causing other employees to treat her differently. *Id.* ¶¶ 45-46. Plaintiff also shared with Garber that she called JPMC's Employee Assistant Program ("EAP") and was referred to a therapist to help her cope with her work situation. *Id.* ¶ 47. Garber informed Plaintiff that she had escalated Plaintiff's complaint to employee relations and that Barrak Green, Vice President of Employee Relations, would be in touch to investigate the issues raised. *Id.* ¶ 48. Plaintiff remained at home for six days before she heard from Green, on April 11, 2017, at which point she explained her concerns about Jensen and Jarnigan. *Id.* ¶¶ 49-50. Green said he would escalate the complaints to Charity Blackburn, Vice-President of Employee Relations. *Id.* ¶ 51.

Around April 14, 2017, Plaintiff learned that Jensen had docked her pay for a week. On April 17, 2017, Plaintiff wrote an email to Defendant Dimon, seeking his assistance. *Id.* ¶¶ 52-53. Dimon never responded directly to Plaintiff concerning the email or any of the subsequent communication Plaintiff directed to him. Around the same time, Plaintiff returned to work and discovered that Cherie Niswonger, Vice President of Employee Relations, had emailed Jensen advising him that Plaintiff had notified Dimon that Jensen had docked her pay and that Plaintiff suffered from anxiety. *Id.* ¶ 59. Plaintiff says that she was in a "panic" that Jensen would become "outright hostile" in response. *Id.* ¶ 60. The next day, April 18, she left work early because, among other things, Plaintiff feared that Jensen "would retaliate against her[.]" *Id.* ¶ 61. Plaintiff, however, does not allege that Jensen did in fact become outwardly hostile or retaliate.

On April 19, 2017, Plaintiff was admitted to a hospital with chest pains, high blood pressure, and breathing issues. The next day, she was then transferred to the hospital's psychiatric unit on suicide alert. *Id.* ¶¶ 62-63. On June 5, Defendant JPMC denied her disability leave of absence, but it was reinstated on June 9, 2017 for thirty days after Dr. Daniel Conti, JPMC's Global

Employee Assistance & Worklife Program Manager, explained that Plaintiff could not be returned to the same situation without risking a relapse. *Id.* ¶ 67.

On July 7, 2017, Plaintiff declined JPMC's offer to extend her disability leave for another thirty days because she felt ready to return to work. *Id.* ¶ 68. From the Complaint, it appears that while Plaintiff remained employed by Defendant after her return, she was not actually working in any specific position until her termination.[6] Clarissa Ramos-Cafarelli was assigned as Plaintiff's contact and represented to Plaintiff that a team of recruiters would help Plaintiff find a new position within JPMC. *Id.* ¶ 69. Plaintiff provided Ramos-Cafarelli with information about the hostile treatment and names of witnesses in order to assist the investigation into Plaintiff's complaints—an investigation which she believes was never initiated. *Id.* ¶ 70. As of July 24, 2017, Plaintiff had not heard back from any recruiter and was working to activate her personal computer so that she could receive and respond to internal emails to find a position on her own. *Id.* ¶ 74.

In an August 10, 2017 letter to Defendant Dimon, Plaintiff referenced "JPMorgan's security stunt where she was portrayed as an 'angry black person' who was a threat to herself and others, clarifying that she was incapable of harming anyone, even herself, despite her prior suicidal ideations." *Id.* ¶ 77. It appears that the reference line to the letter was entitled, "Racism at its best[.]" *Id.* ¶ 75. She also informed Dimon of a "racist situation" and stated, "Please stop harassing me. Please stop judging me by the color of my skin and start respecting me as a person, a black woman who spoke up regardless of the consequences." *Id.*

On August 23, 2017, Plaintiff received a severance agreement which she did not sign. *Id.* ¶ 79. On October 11, 2017, she again wrote to Dimon referencing "Whistleblower-Racism – Separation Agreement[.]" *Id.* ¶ 82. In the communication, Plaintiff also referenced "undercover

---

[6] The Complaint does not indicate whether Plaintiff was fulfilling any other work duties during this time.

racism." *Id.* Plaintiff then wrote to Dimon again the same day, referencing "Three Strikes Against Me[.]" *Id.* ¶ 85. Based on the communication, it appears that Plaintiff was referring to her color, her age, and her lack of a college degree as the three strikes. *Id.* Plaintiff indicated that Defendant did not have any African-American Senior Executive Assistants in "Audit." *Id.* Plaintiff added that black employees were resigning because they do not have a voice, "K" in Audit was on disability because of verbal abuse from a white officer, and a former non-African-American employee who began as Plaintiff's "back-up" had been promoted to Vice President and was making over $250,000 per year. *Id.* Of note, while Plaintiff made these allegations in her communication to Dimon, she does not separately plead them in her Complaint.

On November 3, 2017, Plaintiff was informed that she needed to undergo a fitness for duty evaluation and supply medical records as to her disability leave. *Id.* ¶ 86. In response, Plaintiff wrote to Defendant Dimon on November 8, 2017, with the subject heading "Violation of Medical Rights/Separation Agreement to Close EEOC Complaint." *Id.* ¶ 87. Plaintiff asked Dimon if he would let his daughter provide her medical records. *Id.* Plaintiff received an email, dated November 9, 2017, in which JMPC's legal counsel advise Plaintiff that "she was required to submit to the fitness for duty examination in light of statements she made regarding harming herself and another [JPMC] employee, as well as concerns from her medical provider about the effects on her well-being on her returning to work[.]" *Id.* ¶ 89. Plaintiff states that she had resolved any threats to her own well-being and had never threatened another employee. *Id.* ¶¶ 89-90. Around December 8, 2017, JPMC's medical provider found Plaintiff fit for duty and not a threat to any employee or herself. *Id.* ¶ 92.

Around December 28, 2017, Plaintiff was asked to meet with Galit Pearlman of Recruiting to assist her in finding a new position. *Id.* ¶ 93. Plaintiff traveled to meet Pearlman in person, but

Pearlman apparently was anticipating a telephone conversation. *Id.* ¶ 95. Apparently in response to this miscommunication, Plaintiff wrote Dimon on December 29, stating, "How dare JPMorgan continue to humiliate and degrade me!" *Id.* ¶ 96.

Around February 2018, JPMC was told "in no uncertain terms" that Plaintiff "was not going to resign her employment, was not going to sign the separation agreement, was not going to accept disability leave, but that she did want to return to work in a position which was comparable to the salary, responsibilities and location where she had recently worked." *Id.* ¶ 97. On February 3, 2018, Plaintiff again wrote to Dimon, indicating that JPMC's legal counsel had spoken to Plaintiff derisively when Plaintiff indicated that she wanted to return to work rather than accept a separation package. *Id.* ¶ 98.

In early March 2018, Plaintiff was offered a non-competitive position, which she alleges was several levels below her prior grade and where she had to report to an individual with whom she had difficulties in the past. *Id.* ¶ 100. Plaintiff was then sent on a series of interviews selected by JPMC that she indicates were beneath her experience and expertise. She also went on another series of interviews. Plaintiff was never selected for a position, and she was informed that she "lacked enthusiasm." *Id.* ¶¶ 102-105.

Plaintiff received a letter dated May 24, 2018 from Garber saying that her employment would terminate effective May 29, 2018 if she was unable to find a position with JPMC or if she was not retained in an unpaid status. *Id.* ¶ 107. On May 29, 2018, Plaintiff believed her employment was terminated and subsequently applied for and began to receive unemployment compensation. *Id.* ¶¶ 108-09. In an email dated June 14, 2018, Plaintiff was advised by the New York State Department of Labor ("DOL") that she was being charged with fraud based on JPMC telling DOL that she had not been terminated on May 29, 2018. *Id.* ¶ 110. JPMC referenced

checks issued to Plaintiff after this date, and Plaintiff claims that she believed the money from JPMC was for any accrued but unused personal time off, not for her salary. *Id.* ¶¶ 111-12. JPMC claimed Plaintiff's employment terminated as of June 14, 2018. *Id.* ¶ 113.

## II. PROCEDURAL HISTORY

Plaintiff commenced this action against Defendants on August 1, 2018 in the Superior Court of New Jersey. *See* Compl. The Complaint listed the following counts: (1) racially hostile work environment under the LAD, (2) race discrimination under the LAD, (3) retaliation under the LAD, (4) intentional infliction of emotional distress, (5) negligent infliction of emotional distress, and (6) individual liability under LAD against Defendant Dimon. *Id.* ¶¶ 115-152. Defendants then removed the case to this Court. D.E. 1.

On October 2, 2018, Defendants filed the motion to dismiss, D.E. 9-1; which Plaintiff opposed, D.E. 16; and to which Defendants replied, D.E. 17. In her opposition, Plaintiff voluntarily withdrew her intentional and negligent infliction of emotional distress claims. Opp. at 5. Plaintiff also requested leave to amend her complaint. *Id.* In their reply, Defendants opposed Plaintiff's cross-motion for leave to amend in regard to Plaintiff's claims against Defendant Dimon. Reply Br. at 1.

## III. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) permit a motion to dismiss when a complaint fails "to state a claim upon which relief can be granted[.]" For a complaint to survive dismissal under Rule 12(b)(6), it must contain sufficient factual matter to state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Id.* Further, a plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of her claims." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 789 (3d Cir. 2016).

In evaluating the sufficiency of a complaint, district courts must separate the factual and legal elements. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-211 (3d Cir. 2009). Restatements of the elements of a claim are legal conclusions, and therefore, not entitled to a presumption of truth. *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011). The Court, however, "must accept all of the complaint's well-pleaded facts as true." *Fowler*, 578 F.3d at 210. Even if plausibly pled, however, a complaint will not withstand a motion to dismiss if the facts alleged do not state "a legally cognizable cause of action." *Turner v. J.P. Morgan Chase & Co.*, No. 14-7148, 2015 WL 12826480, at *2 (D.N.J. Jan. 23, 2015).

## IV. DISCUSSION

Defendants argue that Plaintiff's LAD claims should be dismissed because there is no allegation that Plaintiff ever worked for JPMC in New Jersey[7] and the LAD applies only to employees who worked in New Jersey.[8] Def. Br. at 15.

It is well established precedent that if a plaintiff worked exclusively outside of New Jersey, an employment suit in New Jersey will be governed by the substantive law of the state that plaintiff worked in. *See Buccilli v. Timby, Brown & Timby*, 283 N.J. Super. 6, 10 (App. Div. 1995); *see also Satz v. Taipina*, No. 01-5921, 2003 WL 22207205, at *16 (D.N.J. Apr. 15, 2003), *aff'd*, 122 F. App'x 598 (3d Cir. 2005) ("New Jersey courts have consistently applied the law of the state of

---

[7] Defendants assert that Plaintiff worked for JPMC exclusively in New York City for more than 20 years. *See* Def. Br. at 2.

[8] While Plaintiff asserts her claims under the LAD, Title VII is also mentioned in this analysis, as the "[a]nalysis of a claim made pursuant to the []LAD generally follows analysis of a Title VII claim." *Schurr v. Resorts Int'l Hotel, Inc.*, 196 F.3d 486, 498 (3d Cir. 1999).

9

employment to workplace claims and have therefore only applied the NJLAD if the plaintiff worked in New Jersey.").

Accordingly, the Court finds that Plaintiff's claims may not be brought under the LAD, as Plaintiff worked exclusively in New York. Because all of Plaintiff's remaining claims are based on the LAD, Plaintiff's Complaint is dismissed.

Defendants argue that the dismissal should be with prejudice as to Defendant Dimon. An employer may only be found individually liable under the LAD if he aids and abets the action prohibited by the act. *Cicchetti v. Morris Cnty. Sheriff's Office*, 194 N.J. 563, 594 (2008). To impose such liability for an individual under the LAD, a plaintiff must show that defendant (1) aided the party performing a wrongful act that causes an injury; (2) is "generally aware of his role as part of an overall illegal or tortious activity at the time he provides the assistance;" and (3) knowingly and substantially assisted the principal violation. *Id.* (citing *Tarr v. Ciasulli*, 181 N.J. 70, 84 (2004)). An individual defendant will not be found to have aided and abetted any discrimination if the complaint does not allege that such defendant actually discriminated against plaintiff, assisted in the discrimination, or knew he was playing such role. *See DeSantis v. N.J. Transit*, 103 F. Supp. 3d 583, 591 (D.N.J. 2015).

While Plaintiff does assert that Defendant Dimon was aware of the conduct giving rise to the LAD claims, Opp. at 27-28, the allegation that Dimon failed to act is not sufficient to create individual liability. *See Brown v. Joel Tanis & Sons, Inc.*, No. 13-2984, 2016 WL 3951378, at *1 (D.N.J. July 21, 2016) (dismissing individual liability claim brought under the LAD against a company owner who plaintiff claimed had knowledge of LAD violations but failed to actively respond due to this conduct falling short of the "active and purposeful conduct required" to hold an individual liable under the LAD). The Complaint also does not contain sufficient allegations

10

that Dimon knowingly and substantially assisted in creating and perpetuating the environment Plaintiff was allegedly subjected to at JPMC. *See* Compl. ¶¶ 115-121, 148-52; *see also* Opp. at 22-24. It also does not sufficiently allege that Dimon himself knowingly and substantially assisted in any racial discrimination or retaliation against Plaintiff. *See* Compl. ¶¶ 122-29, 130-36, 148-52, *see also* Opp. at 20-22, 24-26. Therefore, Plaintiff has not plausibly pled that Dimon may be liable for claims of hostile work environment, racial discrimination, or retaliation. Yet, because Plaintiff sufficiently alleges that she had numerous direct contacts with Dimon, and because Plaintiff has not yet had an opportunity to file an amended pleading, the dismissal is without prejudice. *See Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002) (observing that absent inequity or futility, courts must allow a plaintiff leave to amend a complaint).

## V. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss, D.E. 9-1, is **GRANTED**. Plaintiff's Complaint is **DISMISSED WITHOUT PREJUDICE**. Plaintiff has thirty (30) days to file an amended complaint consistent with this Opinion. If Plaintiff fails to do so, then the dismissal will be with prejudice. An appropriate Order accompanies this Opinion.

Dated: August 28, 2019

John Michael Vazquez, U.S.D.J.